Louis SHAPIRO, Trustee in the Consolidated Bankruptcy Proceedings of the Estate of Dorothy Hubbard and Grover D. Still, Individually, and the Partnership known as Industrial Contracting Company, Composed of said Dorothy Hubbard and Grover D. Still, and the Estate of Frank Edmund Hubbard, Individually, and as a former partner in the Partnership known as Industrial Contracting Company,

v.

ROYAL INDEMNITY COMPANY, a New York Corporation.

Civ. A. No. 9285.

United States District Court, W. D. Pennsylvania.

Dec. 30, 1954.

Judgment Affirmed June 29, 1955.

See also, D.C., 100 F.Supp. 801.

Max U. Applebaum, Pittsburgh, Pa., for plaintiff.

James J. Burns, Jr., Pittsburgh, Pa., for defendant.

MARSH, District Judge.

### Findings of Fact

In this case, the Trustee in Bankruptcy brought an action against the defendant, a corporation, to recover $10,955.84, together with interest and costs. Following pre-trial conferences, the parties agreed upon the facts and submitted the same for the opinion of the court together with two questions of law which were also set forth. The facts agreed upon by the parties are adopted by the court as if found pursuant to Rule 52, Fed.Rules Civ.Proc. 28 U.S.C. They are:

"1. Louis Shapiro, plaintiff, is a resident of the City of Pittsburgh, County of Allegheny and Commonwealth of Pennsylvania, and, according to the bankruptcy records of this court, is the duly qualified Trustee in the consolidated bankruptcy proceedings of the District Court of the United States for the Western District of Pennsylvania, at Bankruptcy No. 21863, of the Estate of Dorothy Hubbard and Grover D. Still, individually, and the partnership known as Industrial Contracting Company, composed of said Dorothy Hubbard and Grover D. Still, bankrupts, and the Estate of Frank E. Hubbard, Individually, and as a former partner in the partnership known as Industrial Contracting Company, bankrupt.

"2. Royal Indemnity Company, defendant, hereinafter referred to as 'Royal', is a corporation organized under the laws of the State of New York, doing a general surety business.

"3. Jurisdiction of this action (a) is founded on diversity of citizenship; and (b) the plaintiff's allegations that it falls within the provisions of the Bankruptcy Act, Sections 60(b), 70(a) (4), and 70 (e), 11 U.S.C.A. 96(b); 110(a) and 110 (e), as amended, making voidable by Trustee in Bankruptcy any transfer of any bankrupt's property made for the benefit of any creditor on account of an antecedent debt within four months of the filing of a petition in bankruptcy, the effect of which transfer is to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class, and also giving the Trustee in Bankruptcy a right to avoid as against any one but an innocent purchaser for value, any other transfer made or suffered by bankrupt which, under any applicable Federal or State law, constitutes a fraud of the bankrupt's creditors.

"The matter in controversy exceeds exclusive of interest and costs the sum of Three Thousand ($3,000.00) Dollars.

"4. On or about May 14, 1949, and subsequently by amendment on June 29, 1949, Frank E. Hubbard, acting for and on behalf of himself and Grover D. Still, trading as Industrial Contracting Company, entered into a written contract with Bechtel International Corporation, a Delaware corporation having its principal place of business in San Francisco, California, for sandblasting and painting certain steel in the freight yard of the Reading Railroad at Landsdale [sic], Pennsylvania, which steel was there transported by Bechtel preparatory to being transported by sea to Saudi Arabia, where it was to be used in the construction of a pier.

"True and correct copies of this contract and its amendment constitute Exhibits 'A' and 'B' appended to plaintiff's complaint.

"5. The aforesaid contract provided, among other things:

" '1. Contractual Relationship: In the performance of this Subcontract, Subcontractor shall operate as an independent Contractor and not as agent of Contractor. Subcontractor shall hold Contractor and Owner free and harmless from all liability, costs and charges arising out of or in connection with any act or representation of its agents or employees.'

" '2. Items to Be Furnished by Subcontractor: Subcontractor shall supply and furnish at the location where the work is to be performed all items, in-

cluding labor, materials, and equipment, necessary for the complete and satisfactory performance of this subcontract. * * *'

" '12. Liens and Claims: Subcontractor shall indemnify and save harmless Contractor and Owner from all claims, demands, causes of action or suits of whatsoever nature arising out of the services, labor and material furnished by Subcontractor, or its subcontractors, under this Subcontract.

" 'Subcontractor shall immediately pay and discharge, or shall provide security sufficient and satisfactory in itself to its laborers, materialmen or other creditors, or those of its subcontractors, for the payment of any obligation, or alleged obligation, it, or any of its subcontractors may have, in aid of the enforcement of which a lien or right of any kind is established, or is attempted to be established, upon or against the work or the real property upon which the work is situated.

" 'Contractor may, as a condition precedent to any payment hereunder, require Subcontractor to submit complete waivers and releases of any and all claims of any person, firm or corporation. Such release must be submitted covering all such claims as a condition precedent to final payment.'

" '17. Insurance and Bonds: Subcontractor, at its own expense, shall procure, carry and maintain on all its operations hereunder the bonds * * * in the amounts specified in the Subcontract * * *'

" '18. Compensation and Payments:

" '(d) Payments otherwise due may be withheld by Contractor on account of * * * claims filed, or reasonable evidence indicating probability of filing of claims, failure of Subcontractor to make payments promptly to subcontractors or for material or labor, or a reasonable doubt that the subcontract can be completed for the balance then unpaid. If the foregoing causes are removed, the withheld payments shall promptly be made. If the said causes are not removed on written notice, Contractor may rectify the same at Subcontractor's expense * * *'

"6. On or about May 18, 1949, the defendant, Royal, as surety and Frank E. Hubbard and Grover D. Still, trading as Industrial Contracting Company, as principals executed a bond, Exhibit 'C' appended to plaintiff's complaint, whereby they bound themselves to Bechtel International Corporation in a certain penal sum conditioned as follows:

" 'That if the above bounded principal shall well and truly keep, do and perform each and every, all and singular, the matters and things in said contract (between Bechtel and Frank E. Hubbard and Grover D. Still trading as Industrial) set forth and specified to be by the said Principal kept, done and performed at the time and in the manner in said contract specified, and shall pay over, make good and reimburse to the above named Obligee, all loss and damage which said Obligee may sustain by reason of failure or default on the part of said Principal, then this obligation shall be void; otherwise, to be and remain in full force and effect.'

"7. On August 30, 1949, Andrew J. Isacco, trading as Puritan Paint and Oil Company, hereinafter referred to as 'Puritan', who had supplied Industrial with all the paint used by Industrial in carrying out its contract with Bechtel, and who then had an unpaid claim against Industrial for the said paint in excess of $16,000.00, made a long distance telephone call to D. L. Roberts, an authorized agent of Bechtel, threatening to attach two car loads of Bechtel's steel then in the freight yard at Lansdale, if satisfactory arrangements were not made for the payment of his claim.

"8. There was no actual basis, in law or in fact, which would have justified Puritan, or any other Industrial creditor, in filing such an attachment against Bechtel's steel, but Puritan, at that time acting through Isacco, believed at the time it threatened such an attachment that it could be enforced.

"9. Until and unless such a lien as was threatened by Puritan at this time

was asserted, or attempted to be asserted, by an Industrial creditor, the defendant, Royal, had no liability to that creditor under its bond, plaintiff's Exhibit 'C'.

"10. If, however, Puritan had attempted to assert such a lien against Bechtel's steel, defendant, Royal, would at once have become liable for its payment under the terms of its bond, even though the lien could have been discharged eventually as improper.

"11. In response to the threat of Puritan of August 30, 1949, Bechtel, on September 2, 1949, agreed in writing with Puritan to withhold any unpaid balance due Industrial until Industrial should pay Puritan or make arrangements for its payment. At the same time, Bechtel agreed not to release Royal under its bond, plaintiff's Exhibit 'C', until Industrial should pay Puritan or make satisfactory arrangements for its payment.

"12. Bechtel at no time made any similar commitment to any other Industrial creditor.

"13. In reliance on Bechtel's aforesaid communications of September 2, 1949, Puritan made no attempt to assert a lien on the Bechtel steel at Lansdale, and the same was subsequently shipped to Saudi Arabia.

"14. Also on September 2, 1949, pursuant to its agreement with Puritan, Bechtel, by a letter a copy of which constitutes Exhibit 'I' attached to defendant's Answer, informed Industrial that, in accordance with item 12 of its subcontract, it would withhold final payment from Industrial until Industrial furnished it with waivers or releases from all suppliers of material and equipment with whom it had done business under its sub-contract.

"15. The sum which the plaintiff seeks to recover in this action is that retained by Bechtel in accordance with its aforesaid agreement with Puritan.

"16. Neither Industrial nor the plaintiff ever furnished Bechtel with the waivers or releases required in its aforesaid letter of September 2, 1949, and on September 20, 1949, by a letter which constitutes Exhibit II appended to defendant's Answer, the bankrupt Frank E. Hubbard, acting for Industrial, advised Bechtel that said waivers and releases would not be forthcoming.

"17. On October 6, 1949, Bechtel wrote Industrial that, if Industrial could not furnish it with the waivers and releases which Bechtel had requested, it was willing to deposit the retained funds with Royal on receiving Industrial's written consent to this transfer, together with a statement by Royal that it would use the funds thus transferred for the payment of Industrial obligations growing out of the Bechtel contract, and a further agreement by Royal to indemnify Bechtel against Industrial creditors having claims incurred in connection with the said contract.

"18. On October 6, 1949, by a letter which constitutes Exhibit 'III' appended to defendant's Answer, Bechtel forwarded Royal a copy of its aforesaid communication to Industrial and asked whether or not Royal was willing to accept the retained funds on the terms therein stated.

"19. At the time of its receipt of the aforesaid letter from Bechtel, Royal asserted that it was unwilling to accept Bechtel's offer to pay over the retained sums for the reason that it, Royal, was not liable under its bond for the payment of any Industrial creditor, none of them having asserted any lien against the work.

"20. On November 8 and 18, 1949, Puritan, through its Pittsburgh attorney, demanded that Bechtel furnish it with copies of its contract with Industrial and defendant's performance bond, and when Bechtel refused to divulge this information, Puritan informed Bechtel of its intention to immediately sue Industrial and Royal in Pennsylvania. At the same time, Puritan informed Bechtel that, by reason of the fact that it had waived whatever right it might have had to attach Bechtel's steel on the strength of the telephone conversation of August 30, 1949, and Bechtel's letter of September 2, 1949, referred to above, Puritan was

also contemplating suit directly against Bechtel. And, to that latter end, Puritan demanded information as to the terms of Bechtel's principal contract and the bond securing its performance. Subsequently, Puritan retained counsel in Delaware to institute suit against Bechtel, though such suit was never actually commenced.

"21. On November 21, 1949, at No. 1284 January Term, 1950, Puritan instituted suit in the Court of Common Pleas of Allegheny County, Pennsylvania, against Royal, and Dorothy Hubbard and Grover D. Still, individually and trading as Industrial Contracting Company, a partnership, and in this proceeding Royal asserted as one defense, among many, that the plaintiff was without right of recovery under Royal's bond to Bechtel because that bond, and the contract whose performance it secured, was entered into by Frank Hubbard and Grover D. Still, trading as Industrial Contracting Company, and not by Dorothy Hubbard and Grover D. Still, trading as Industrial Contracting Company, the alleged entity sued by the plaintiff.

"22. On January 16, 1950, after being informed that the Federal Government had filed liens for unpaid taxes, against Industrial in Pittsburgh, Royal, to protect the funds retained by Bechtel from such a lien as might subsequently be filed against Industrial in California, informed Bechtel that it was now willing to accept the retained sum on the terms which Bechtel had specified in its letter of October 6, 1949.

"23. On January 18, 1950, by a letter which constitutes Exhibit 'D' appended to plaintiff's complaint, Industrial formally consented to Bechtel's paying Royal the retained sum and released Bechtel from any obligation which it might otherwise have in connection with its contract with Industrial, plaintiff's Exhibits 'A' and 'B'.

"24. On February 1, 1950, Bechtel paid over to Royal the sum which it had retained under its contract with Industrial, and Royal, in exchange for that payment, executed an Agreement of Indemnity, Exhibit 'IV' appended to defendant's Answer, by which it agreed to use the sum delivered to it for payment of Industrial's creditors under the Bechtel contract, without, however, admitting by such acceptance that it was legally liable to any such creditors. Royal also agreed to indemnify Bechtel against any loss which it might suffer by reason of the delivery of this sum to Royal.

"25. Bechtel's prime motive for requiring this hold harmless agreement from Royal, as a condition precedent to paying over the retained sum, was to protect itself from the pending claim of Puritan.

"26. At the time it received the retained sum from Bechtel, Royal knew, or had reason to know, that Frank E. Hubbard and Grover D. Still, trading as Industrial, were insolvent.

"27. On February 2, 1950, a Petition of Involuntary Bankruptcy was filed against Dorothy Hubbard and Grover D. Still, individually, and the partnership known as Industrial Contracting Company, composed of said Dorothy Hubbard and Grover D. Still, and on February 24, 1950, they were adjudged to be Bankrupt in the District Court of the United States for the Western District of Pennsylvania at No. 21863.

"28. On April 10, 1950, Frank E. Hubbard, individually and as a former partner in the partnership known as Industrial Contracting Company filed his Voluntary Petition in Bankruptcy, and was forthwith adjudged to be a bankrupt, in the District Court of the United States for the Western District of Pennsylvania at No. 21877, which proceeding was consolidated, on May 10, 1950, at No. 21863 with that involving the bankruptcy of Dorothy Hubbard and Grover D. Still.

"29. On May 5, 1950, defendant, after being informed by the plaintiff of the aforesaid bankruptcy proceeding and requested to hold for the plaintiff the sum received from Bechtel, applied

that entire sum in settling for $12,000.00 the claim of Puritan.

"30. This settlement was to have been accomplished by having Puritan execute a release of Royal and Bechtel, discontinue its pending action against Royal and Dorothy Hubbard and Grover D. Still trading as Industrial Contracting Company, file another action against Royal and Frank Hubbard and Grover D. Still, trading as Industrial Contracting Company, and mark the second action settled and discontinued. However, though the release of Royal and Bechtel was given, the first action discontinued, and a complaint prepared with which to commence the proposed action, the latter complaint was never filed.

"31. In its original Answer to plaintiff's complaint herein, defendant averred that the retained sum received from Bechtel was applied to settling Puritan's suit against Royal and Dorothy Hubbard and Grover D. Still, trading as Industrial Contracting Company, but subsequently, with the permission of the court granted over the plaintiff's objection, the defendant amended its Answer to state the facts as they have been set forth in 30 hereof."

On December 20, 1954, paragraph 15 of the case stated was amended as follows:

"15. The sum which the plaintiff seeks to recover in this action is that retained by Bechtel in accordance with its aforesaid agreement with Puritan, to-wit, Ten Thousand Nine Hundred Fifty-Five Dollars and Eighty-Four Cents ($10,955.84)."

### Discussion

From the foregoing facts, it is obvious that there were two partnerships: first, Industrial Contracting Company, which entered into the painting contract with Bechtel in May and June, 1949, and, second, Industrial Contracting Company, the bankrupt partnership, which continued the business of the first partnership.

The plaintiff and the defendant, in their briefs on the law involved in this very complicated litigation, do not differentiate between the two partnerships but treat the bankrupt partnership as succeeding to the rights and liabilities of the contracting partnership. In this opinion we shall pursue the same method of treatment, since the plaintiff is not only bankruptcy trustee for the partnership but also for all the partners of both partnerships as individuals.[1] All of these proceedings are consolidated in this court.

From the stipulated facts, we conclude that Industrial, the bankrupt partnership, authorized or ratified the letter written by Frank E. Hubbard, former partner, to Bechtel on September 20, 1949 (F. 16)[2] and authorized or ratified the letter written by Frank E. Hubbard on January 18, 1950 to Bechtel (F. 23).

Following the statement of facts, the parties appended the following questions to the case stated:

"1. Did Bechtel's transfer to Royal on February 1, 1950, and Industrial's consent thereto of January 18, 1950, constitute a voidable transfer within the meaning of the Federal Bankruptcy Act?

"2. If the transfer of February 1, 1950, was not a voidable transfer under the Federal Bankruptcy Act, but a transfer in trust, did Royal's payment to Puritan of the entire sum received under this transfer, and its refusal to deliver that sum to the plaintiff as Trustee in Bankruptcy for all Industrial partners, constitute a breach of the trust under which Royal received this sum from Bechtel, and such a breach of trust for which claim might be made in this proceeding by the present plaintiff?"

In our opinion, the answer to the first question should be in the affirmative, which, of course, dispenses with an an-

---

1. See: 52 Stat. 845 (1938), 11 U.S.C.A. § 23, sub. i.

2. F. is used to indicate the Finding of Fact agreed to.

swer to the second question. Specifically, we think a voidable preference arose when Bechtel on February 1, 1950, with the prior consent of Industrial, paid $10,955.84 to Royal for payment to those creditors of Industrial who supplied material and labor under the Bechtel contract.

In order to ascertain whether there is a preference, Section 60, sub. a, of the Bankruptcy Act[3] requires us to look for the following elements: A transfer of property of the debtor, to or for the benefit of a creditor, for or on account of an antecedent debt, suffered by such debtor while insolvent, within four months before the filing by or against him of a petition in bankruptcy, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

■ There can be no preference and no recovery by the trustee if any of the foregoing elements are absent in the transfer of $10,955.84 by Bechtel to Royal. In re Nizolek Furniture & Carpet Co., D.C.D.N.J.1947, 71 F.Supp. 1012, affirmed 3 Cir., 1948, 165 F.2d 788, certiorari denied Augelli v. Ohio Finance Corp., 1948, 334 U.S. 816, 68 S.Ct. 1072, 92 L.Ed. 1746.

■ The agreed facts establish that: Bechtel transferred to Royal the property, i. e., $10,955.84, which it had retained under its contract with Industrial (F. 24). This money was transferred to Royal for the benefit of creditors[4] (FF. 17, 24) of Industrial arising out of the Bechtel contract, one of which was Puritan (F. 7). There is no dispute that the transfer was for and on account of antecedent debts incurred by Industrial under the Bechtel contract,

and was suffered by Industrial while insolvent (F. 26), and within four months before the filing of a petition in bankruptcy for or against the partnership (FF. 24, 27, 28). The effect of the transfer was to enable a creditor (Puritan) to obtain a greater percentage of its debt than some other creditor of the same class. Puritan's claim was $16,000 (F. 7). We take judicial notice that the other creditors of Industrial will not receive a like percentage of their claims.[5] Ehrlich v. Mindel, D.C.E.D.N.Y.1949, 9 F.R.D. 308.

Royal contends that the $10,955.84 belonged to Bechtel to dispose of as it desired; therefore, the only element in serious dispute is the ownership of this money at the time of the transfer. We think it was the property of Industrial.

Because of the agreement Bechtel had made with Puritan to withhold the balance of the money due to Industrial until Industrial should pay Puritan (F. 11), Bechtel insisted that Industrial perform the condition precedent (F. 14) contained in their contract and submit releases and waivers from all suppliers of material and labor. Nothing more than this remained to be done under the contract by Industrial since the actual work of sandblasting and painting the steel beams had been fully and satisfactorily performed and the steel had been exported to Saudi Arabia.

■ Benefited by Industrial's complete performance of the actual work contracted for, Bechtel could not cancel or discharge its obligation to pay the balance due Industrial thereunder simply because the latter was unable to perform the condition precedent. Under the equitable doctrine of substantial performance, Industrial would be enti-

---

3. 52 Stat. 869 (1938), 11 U.S.C.A. § 96, sub. a.

4. It is indicated in defendant's Ex. III that there were other Industrial creditors among which was Dravo Doyle Company, which is listed as an unsecured creditor for $3,892.28 in the schedules of the partnership and all three indi-

viduals in the consolidated proceedings in bankruptcy.

5. Industrial's bankruptcy records show: priority creditors: $45,662.56; unsecured creditors: $24,775.81; administrative expenses; upwards of $3,000; appraised value of assets of partnership: $12,501.-50; personal assets of individual partners: approximately $1,800.

tled to the balance due less any damages suffered by Bechtel. Restatement, Contracts, §§ 274, 275 (1932); Sgarlat v. Griffith, 1944, 349 Pa. 42, 36 A.2d 330.

Because the condition was not performed, Bechtel claimed,[6] and perhaps had, the right to withhold this balance until its damages if any were determined,[7] but in addition paragraph 18 (d) of the contract gave Bechtel the right to withhold payments "on account of * * * failure of Subcontractor (Industrial) to make payments * * * for material * * *", and if this cause for withholding was "not removed on written notice" Bechtel could *"rectify the same at Subcontractor's expense * * *"* (emphasis added). Implicit in these words is financial loss to Industrial. Thus when Bechtel paid the balance due Industrial to Royal for payment to some of Industrial's creditors, including Puritan,[8] *it was at Industrial's expense,* and consequently there was a diminution of Industrial's assets by $10,955.84.

That this balance was an Industrial asset is corroborated by Bechtel's request for Industrial's consent to transfer this retained fund to Royal. Bechtel's request was conduct in recognition of its debt to Industrial. The latter's consent was an acquiescence in Bechtel's right to apply the balance withheld under paragraph 18(d) in payment of material.

█ In addition, although Bechtel at first insisted upon the performance of the condition precedent and wrote to Industrial that it would withhold final payment, it later initiated the arrangement whereby the retained fund was paid to Royal. This action was taken after harassment and annoyance by Industrial's creditors. Obviously, the condition precedent was incorporated in the contract solely for the benefit of Bechtel. Thus Bechtel, by its conduct in giving up its claimed right to withhold the money for non-performance of the condition and paying it to Royal, with Industrial's consent, waived the performance of the condition.[9] See: Di Giuseppe v. Di Giuseppe, 1953, 373 Pa. 556, 96 A.2d 874; Shaw v. Lewistown and Kishacoquillas Turnpike Co., 1831, 2 Pen. & W. Pa., 454; Restatement, Contracts, § 88, comment c, §§ 297, 308 (1932); 3 Williston, Contracts, § 678 (1936).

Hence, all the elements necessary to constitute a preference under Section 60, sub. a, are present in the transfer of the $10,955.84 to Royal on February 1, 1950. It remains for determination whether the preference was voidable.

Section 60, sub. b, of the Bankruptcy Act provides in part:

"Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."

Royal, of course, knew when it received the money that Industrial was insolvent (F. 26). It is certain that Puritan, the creditor of Industrial who subsequently actually received the money from Royal, was at the time of the

---

6. See defendant's Exs. I, II, III attached to Answer.

7. In defense of a suit to recover the balance due, Bechtel might be entitled to deduct any damages which it suffered from the failure of Industrial to perform the condition precedent; the only foreseeable damages are those which might arise out of the breach of Bechtel's contract with Puritan and these seem quite speculative. In this connection, it is to be noted that Bechtel did not promise *to pay* Puritan's claim; and since Industrial was not a party to this contract between Bechtel and Puritan, the latter gained no rights by virtue thereof in the $10,955.84 due Industrial.

8. It appears from defendant's Exhibit III attached to Answer that there were other creditors of Industrial under this contract; but Puritan received the entire balance due in settlement of its law suit against Industrial and Royal. FF. 21, 30.

9. See defendant's Ex. III.

transfer on February 1, 1950, a "creditor * * * to be benefited" by the preference.

From the agreed facts it can reasonably be inferred that Puritan on the date had reasonable cause to believe that Industrial was insolvent.

As early as August 30, 1949 when Puritan found it could not collect any part of the $16,000 due for paint from Industrial, it threatened to attach Bechtel's steel; by virtue of this threat it succeeded in getting the promise of Bechtel to withhold from Industrial the unpaid balance due under the contract. In November, 1949, Puritan threatened suit against Royal, on its performance bond, and against Bechtel on the latter's promise; in that same month it actually brought suit against Royal, as surety, and against Industrial, as principal. Puritan, from its strenuous efforts to collect, unquestionably learned prior to February 1, 1950, that Industrial could not pay its creditors.

Thus, under the provision above quoted, we think the preference was voidable. Section 60, sub. b, further provides in cases of voidable preferences that:

> "[T]he trustee may recover the property or, if it has been converted, its value *from any person who has received or converted such property * * *.*" (Emphasis supplied.)

This provision does not require the recipient to bear any special relationship to the bankrupt, such as a creditor; therefore, the transfer to Royal, a person pursuant to the definition under the Act,[10] can be voided by the plaintiff trustee, and he can recover from Royal who, after notice and demand, converted the money by paying $10,955.84 to Puritan (F. 29).

Even if the preference is not voidable, we think the trustee may recover from Royal.

Before bankruptcy, as we have found, the $10,955.84 was an asset of Industrial subject to the control of Bechtel under paragraph 18(d) of the contract. After bankruptcy, we find Royal in possession of this money as an admitted trustee[11] of the fund for "distribution among the creditors of Industrial" arising under the Bechtel contract (See: defendant's Exhibit IV, F. 24). This trusteeship was created by Bechtel and the transfer to Royal approved with Industrial's knowledge and express consent (F. 23).

The status of Royal then, after Industrial's bankruptcy, is that of a trustee in possession of part of the assets of a bankrupt for the benefit of some but not all of the creditors of the bankrupt. If all these facts had been undisputed in May, 1950, the trustee could certainly have recovered the money then in a summary proceeding against Royal. See: Section 2(21) of the Bankruptcy Act;[12] May v. Henderson, 1925, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870. But because of the intense dispute which then existed as to the facts and particularly as to the law, a summary proceeding would have been futile. Harrison v. Chamberlin, 1926, 271 U.S. 191, 46 S. Ct. 467, 70 L.Ed. 897; Cline v. Kaplan, 1944, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97; Section 23 of the Act.[13]

Although May v. Henderson, supra, was a summary proceeding, we think the principles therein expressed are applicable to this plenary action. There it appeared that after bankruptcy a part of the assets of the bankrupt were still in the hands of assignees for the benefit of creditors. The assignees paid some of this money to one of the creditors,

---

10. 52 Stat. 840 (1938), 11 U.S.C.A. § 1 (23).

11. Royal maintains in its brief (p. 20) that it was a trustee of the fund constituted as such by Bechtel; of course, it does not admit that Industrial had any inter-

est in the fund but contends that the money belonged to Bechtel.

12. 52 Stat. 842 (1938), 11 U.S.C.A. § 11, sub. a (21).

13. 52 Stat. 854 (1938), 11 U.S.C.A. § 46.

enabling it to obtain a preference, as in the case at bar. The trustee in bankruptcy sought to recover from the assignees, and the Supreme Court said:

"Nor is it any answer to such a proceeding that the diverted assets are no longer under the control of the assignees. * * * The duty of a fiduciary to account for property intrusted to his care is fulfilled by delivery of the property, but, if he has put it out of his power to deliver it, he may nevertheless be compelled to account for its worth." 268 U.S. at page 119, 45 S.Ct. at page 460.

Accordingly, it was held that fiduciaries in possession of an asset of the bankrupt after actual notice of bankruptcy are liable to the bankruptcy trustee if they divert that asset "to the payment of a favored creditor". May v. Henderson, supra.

The advent of Industrial's bankruptcy superseded the duties of Royal, as a trustee, to pay off some of the bankrupt's creditors. As in cases involving assignees for the benefit of creditors, after bankruptcy intervened Royal held the fund for the bankruptcy trustee. When after ample warning and with full knowledge of the facts and circumstances, Royal paid this money, which had all the earmarks of a preference, to Puritan, it took a calculated risk that it would be held liable to account under the law. Cf. 1 Collier, Bankruptcy, par. 2.78[3] (14th ed. 1940); 2 id. par. 23.06[9].

It is the opinion of the court, therefore, that plaintiff trustee can recover from Royal on two grounds: first, for converting the property of the bankrupt under Section 60, sub. b, because the transaction constituted a voidable preference; and, second, for disposing of said property after notice of bankruptcy and request by the plaintiff to hold it for use of the bankrupt's estate.

It is also our opinion that the plaintiff is entitled to interest from January 5, 1951, the date on which the complaint was filed. Kaufman v. Tredway, 1904, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190.

### Conclusions of Law

1. The court has jurisdiction of this plenary proceeding to avoid a preferential transfer pursuant to Section 60, sub. b, of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. b, as well as jurisdiction pursuant to 28 U.S.C.A. § 1332, the parties being citizens of different states and the sum involved exceeding the jurisdictional amount.

2. Industrial Contracting Company, a bankrupt partnership of which Dorothy Hubbard and Grover D. Still, both individually bankrupt, are partners, and Frank E. Hubbard, individually a bankrupt, was a former partner, is subject to the terms, conditions and liabilities and entitled to the benefits of the contract entered into between Industrial Contracting Company and Bechtel International Corporation in May and June, 1949.

3. The payment by Bechtel to the defendant, Royal Indemnity Company of the balance due Industrial under the Bechtel—Industrial contract in trust for distribution among some of Industrial's creditors was a voidable preference within the meaning of Section 60, subs. a and b of the Bankruptcy Act, 11 U.S.C.A. § 96, subs. a and b.

4. After notice of bankruptcy and demand, the payment of $10,955.84 by Royal Indemnity Company to Puritan Paint & Oil Company was an unlawful conversion of the property of Industrial and is recoverable by its trustee in bankruptcy from Royal.

5. Judgment should be entered in favor of plaintiff, Louis Shapiro, trustee, against the defendant, Royal Indemnity Company, in the sum of $10,955.84, with interest from January 5, 1951, and costs.